IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-20152-JTF-tmp |
| | ) | |
| | ) | |
| TRAVIS LESTER, | ) | |
| | ) | |
| Defendant. | ) | |

---

## AMENDED REPORT AND RECOMMENDATION

---

Before the court is defendant Travis Lester's Motion to Suppress, filed on December 8, 2021. (ECF No. 28.) The government filed its response on January 14, 2022. (ECF No. 37.) The undersigned conducted a suppression hearing on March 8, 2022. (ECF No. 49.) Argument was heard and witnesses were called by both sides. For the below reasons, it is recommended the Motion to Suppress be denied.

### I. PROPOSED FINDINGS OF FACT

The following proposed facts are taken from the sworn testimony presented at the suppression hearing. Where factual conflicts were presented, these facts represent the undersigned's resolution of those conflicts after considering the credibility of the witnesses and supporting evidence.

In January 2021, U.S. Marshal Warrant Team Leader Deputy

Trayon Murray was assigned an arrest warrant for Travis Lester.
(T. 24.) The warrant sought Lester's arrest for a federal
supervised release violation. (T. 24.) Deputy Murray had also
adopted a state warrant issued for Lester on aggravated assault
charges, as well as a warrant issued for one Shebrica Phillips.
(T. 24.) Phillips was Lester's girlfriend and suspected of
having participated in the alleged aggravated assault, which had
involved the use of a firearm. (T. 33-34.) On May 19, 2021, a
confidential informant told Murray that Phillips and Lester were
staying at the Villa Inn motel on Third Street in Memphis,
Tennessee. (T. 25.) Deputy Murray, along with a team of U.S.
Marshals and Shelby County Fugitive Team members, drove to the
Villa Inn to investigate and arrived at around 1:00 p.m. (Ex. 4
at 2.) Upon arriving, Deputy Murray and another deputy
questioned motel staff about whether Phillips and Lester were
currently staying there. (T. 25.) The Villa Inn's policy was to
make copies of guests' photo IDs, and staff presented Deputy
Murray with a copy of Phillips's ID and informed him that she
was staying in Room 110. (T. 25.)

As depicted by the photos admitted at the hearing, the
layout of Room 110 was substantially similar to a typical motel
room. The room was one open space except for a separate
bathroom. Upon entering, a window took up most of the exterior
wall, with a table, two chairs, and a small fridge set beside

the window. (Ex. 1 at 003.) A bed with nightstands on each side was set further back in the room from the table, with the headboard flush against the right wall. (Ex. 1 at 003.) A microwave sat on the nightstand closest to the window. (Ex. 1 at 003-004.) The left wall of the room was bare except for a long, waist-high dresser and a mounted television. (Ex. 1 at 002.) Along the back of the room there was an open entryway to a smaller area with a sink. When facing the sink from this entryway, there was a bent towel rack mounted to the left, (Ex. 1 at 005), and to the right was a door leading to a bathroom containing a shower and toilet. (Ex. 1 at 006.)

After learning that Phillips was staying in Room 110, Deputy Murray called the other team members, who were stationed across the street at Crystal Palace Skating Rink, to come and assist with the arrest. (T. 36-37, 89.) The team, which included Shelby County Sheriff's Detective Joshua Fox, lined up in a "stack" on the door of Room 110. (T. 25.) None of the officers were wearing body cameras. (T. 39-40.) Officer Justin Bischoff of the Shelby County Sheriff's Department was first in line. (T. 73.) Officer Bischoff knocked and announced, and told whoever was inside to open the door. (T. 25-26.) After around one or two minutes, Phillips opened the door voluntarily and stepped back into the room, while Lester stepped out of the door and was grabbed by the officers. (T. 38.) Lester was then passed back to

Murray. (T. 38.) Deputy Murray immediately noticed a "plastic bagg[ie] and a bulge" in Lester's front pocket. (T. 42.) Deputy Murray searched Lester's pocket, pulling out a plastic baggie with a "rock-like substance" inside. (T. 43.) He also found a "wad of cash" in Lester's other pocket, which was later determined to total $869. (T. 26, 69.) Murray put this money back in Lester's pocket. (T. 68.) After finding these items, Deputy Murray asked Lester if he had "anything else on [him], drugs or anything that will harm me, stick or harm me." (T. 45.) In response, Lester stated that there was "just some weed in the room." (T. 46.)

While Deputy Murray secured Lester, the other members of the team entered the room to apprehend Phillips. (T. 73-74.) ("Then we stepped into the foyer of the – not the foyer, but the entry of the room and ordered Ms. Phillips . . . we ordered her out because she had an active warrant, as well.") Detective Fox and others ordered Phillips out of the room, and she came out willingly and was handcuffed. (T. 80-81.) As Phillips was handcuffed, another member of the team entered the room intending to do a safety sweep.[1] (T. 74.) This officer "went immediately past the bed into the room where there was a

---

[1]Detective Fox identified this officer as a "Detective Crynor" but neither the spelling nor first name was ever confirmed.

bathroom, and then he came out."[2] (T. 74.) While in the room, he "looked back between the bed and mirror and then into the bathroom, and then turned around and came back out." (T. 75.) This officer informed Detective Fox that he saw a digital scale sitting on the nightstand furthest away from the door. (T. 76.) At some point afterward, Deputy Murray told Detective Fox about the baggie he had found on Lester and that Lester had told him there was marijuana in the room. (T. 76.)

After hearing this, Detective Fox called Detective Randy Lee of the Shelby County Sheriff's Department Narcotics Division and informed him of the events. (T. 76.) The policy of the Sheriff's Department dictated that if contraband was ever found, the Narcotics Division would be called in. (T. 87.) Detective Lee then called his partner, Detective Jaeger Zuck, and asked him to come and assist on the scene. (T. 143.) Detective Lee arrived fifteen to twenty minutes after Fox called him, (T. 87), and Detective Zuck arrived roughly fifteen to twenty minutes after that, at approximately 2:00 p.m. (T. 169.) When Detective Lee arrived, he spoke with Deputy Murray, who showed him the baggie with the rock-like substance. (T. 104-5.) Detective Lee

---

[2]Lester argued in closing that the room was searched at this point, and that during this search the evidence described below was found. However, no testimony or other evidence in support of this theory was offered and the undersigned credits the testimony of the officers that they had only conducted a protective sweep at that time.

then tested the substance with a "NARK II Scott Reagent chemical test kit," which returned "a presumptive result of positive for content of cocaine." (T. 105.) With this test result in hand, Detective Lee then applied for a search warrant to search Room 110. (T. 105.) This search warrant was written and printed on the scene using a remote computer and printer. (T. 105-6, 117-18.)

The affidavit in support of the search warrant, written by Detective Lee, stated that the confidential informant called "at approx. 1300 hours" to inform of Phillips's and Lester's location. (Ex. 3 at 2.) Detective Lee included three pieces of evidence in the affidavit to support probable cause to search the room. First, he noted that "[d]etectives observed a digital scale in plain-view on bedside table of the room." (Ex. 3 at 2.) Second, he stated that "detectives located a baggie containing a white rock-like substance believed to be crack cocaine (Approx. 20 rocks) inside of Lester's left front shorts pocket" and included the positive test result for cocaine. (Ex. 3 at 2.) Third, he wrote that "[d]etectives asked Lester if he had any more drugs on his person to which he stated 'there's some weed in the room,' referring to Room #110." (Ex. 3 at 2.) The search warrant was then presented to Judicial Commissioner Lee Wilson over remote video conferencing, who signed it at 2:22 p.m. (T. 105-6, 117; Ex. 3 at 1.) The drafting and signing of the warrant

-6-

all took place "within an hour." (T. 170.) At the suppression
hearing, Detective Lee also testified that, even if Lester had
not told Deputy Murray that there were drugs in the room, and
even if the digital scale had not been seen, he would have
nevertheless applied for the search warrant due to the cocaine
found in Lester's pocket. (T. 141.)

   Once the search warrant was signed, Detectives Lee and Zuck
undertook a search of Room 110. (T. 123.) Detective Zuck took
photographs as the search progressed and personally located all
relevant evidence.[3] (T. 130, 132.) The photographs begin with a
timestamp of 13:47, which would indicate that the search began
at 1:47 p.m. (Ex. 6 at 001.) However, Detective Zuck later
testified that this timestamp was incorrect. (T. 152.) Detective
Zuck stated that the camera used was "issued by the department"
and that the timestamp is not viewable when the photos are
taken. (T. 153.) Department practice is to not alter any
settings or stored photos on the cameras, in order to preserve
the chronology of every picture taken. (T. 153.) Detective Zuck
could not provide an exact time for when the photos were taken,

---

[3]At the hearing, both sides submitted copies of these
photographs, entered as Exhibits 5 and 6. However, the two sets
are numbered differently, with Exhibit 5 containing its own
individual numbering starting at 001, and Exhibit 6 using Bates
numbering starting at 119. When citing either set, the numbering
at the end will refer to the individual photograph cited. For
example, the first photograph in Exhibit 5 is listed as "T.
Lester 119." In the text, this photograph would be cited as "Ex.
5 at 119."

but believed that the timestamp could be an hour off (i.e. indicating the first photo was taken at 2:47 p.m.) due to Daylight Savings Time. (T. 168.) Regardless, the search documented by the photos began at some point after 2:22 p.m., as indicated by a photo timestamped "13:50" showing the printed and signed search warrant inside Room 110. (Ex. 6 at 005.)

Approximately five minutes into the search, Detective Zuck saw a clear plastic bag on the floor by the bed containing a Nintendo Gamecube controller, men and women's clothing, and what appeared to be the handle of a handgun with a red extended magazine. (T. 147; Ex. 6 at 006.) The handgun was loaded; Detective Zuck unloaded it and documented its serial number. (T. 148, Ex. 6 at 008-012.)

Two minutes after finding and photographing the handgun, Detective Zuck examined a "black backpack that was located on the right-hand side of the bed." (T. 149; Ex. 6 at 013.) Upon opening the outermost pocket on the backpack, Detective Zuck saw a "clear cellophane bag, which contained a green leafy substance" that he suspected was marijuana. (T. 149; Ex. 6 at 013-014.) Later tests would confirm that the bag contained 0.9 grams of marijuana. (Ex. 4 at 2.) Detective Zuck then moved to the nightstand on the left side of the bed, which was "immediately to the right" of the clear bag of clothing described above, where he took a photograph of the digital scale

-8-

officers had previously observed. (T. 150; Ex. 6 at 016.) At some point during the search, Detective Zuck also picked up the mattress on the bed frame and moved it off center, in order to check for anything hidden underneath. (T. 151-52.) The last photo in the set shows all of the obtained evidence (the gun, its holster, the digital scale, and the two plastic baggies) arranged on the dresser along the wall opposite the bed. (T. 154-155; Ex. 6 at 017.) The money previously found on Lester was not photographed, which Detective Zuck explained was because "[money] is handled in a different way, not an evidentiary item." (T. 160.) Since the money "would not have been taken to the property room where it would have been tagged and tested," it would instead "have been seized at our office" and "placed into a separate envelope." (T. 160.) Lester and Phillips sat on the curb outside of Room 110 while the room was being searched.[4] (T. 171.) The two were taken away from the scene by police car after "probably an hour and a half, two hours or so." (T. 171.)

_____

[4]At the suppression hearing, Lester called Phillips as a witness, but she asserted her Fifth Amendment rights and declined to answer any questions. Lester then sought to introduce the testimony of his own investigator, Race Bennett, who had previously interviewed Phillips over the phone about this incident. For the limited purpose of allowing Lester to make an offer of proof and develop the record, the undersigned allowed Bennett to testify. In substance, Bennett testified that according to Phillips, officers at some point searched Room 110 while she was outside of the room and that money was seized from her. The court finds this testimony to be irrelevant to the issues, as well as inadmissible.

Three days later, on May 22, 2021, Detective Lee swore out
an affidavit of complaint in support of arrest warrant
applications "for both Mr. Lester and Ms. Phillips for the
evidence that was obtained in the hotel room." (T. 107, Ex. 4 at
3.) In this affidavit, Detective Lee again described the chain
of events leading up to the search of Room 110. (Ex. 4 at 2.)
Detective Lee stated that "upon reasonable belief that evidence
related to the above described incident was located within [Room
110], [he had] respectfully requested that a search warrant be
issued for the address/room." (Ex. 4 at 2.) The affidavit then
notes that the search resulted in the following evidence:

> "1-Baggie of green leafy substance (located by Det.
> Zuck in a bag on bed), 1-Digital Scale (located by
> SCSO F.A.T. Detectives on left bedside table), 1-Smith
> & Wesson M&P 2.0 .40 caliber handgun (SN # NHP5224),
> loaded/chambered W-16 rounds in nylon holster (located
> by Det. Zuck in a bad of mens and womens clothing in
> floor of left side of bed)."

(Ex. 4 at 2.) The gun was later determined to be stolen, the
rock-like substance was confirmed to be 4.9 grams of cocaine,
and the green leafy substance was later confirmed to be 0.9
grams of marijuana. (Ex. 4 at 2.)

The affidavit of complaint ends with the following
paragraph:

> Both subjects were transported to jail on their
> respective arrest warrant charges. Travis Lester was
> found to have Crack Cocaine on his person and a
> Digital Scale, Marijuana, and a Stolen Gun in his
> room, therefore a warrant was issued. Shebrica

-10-

> Phillips was found to have Marijuana, a Digital Scale
> and a Stolen Gun in her room, therefore a warrant was
> issued. These events occurred in Shelby County, TN.

(Ex. 4 at 2.) On cross-examination, Lester argued that this wording was confusing and raised the possibility that Detective Lee's reference to a warrant being issued referred to the original search warrant, implying that the search warrant was issued only after the officers had already searched Room 110. (T. 137-38.) However, Detective Lee testified that the "warrants" he was referring to in the above paragraph were the yet-to-be-issued arrest warrants that he was applying for through this affidavit of complaint. (T. 110, 137-38.) The undersigned credits Detective Lee's testimony, and finds that the officers did not conduct a search of Room 110 before applying for the search warrant. Ultimately, an arrest warrant was issued based on this affidavit and signed by a judicial commissioner on May 22, 2021. (Ex. 4 at 3.)

Lester was charged with violations of 18 U.S.C. §§ 922(g)(1) and (g)(9), for being in possession of a firearm after having been convicted of a misdemeanor crime of domestic violence and of a felony. (ECF No. 1.) Lester filed the present Motion to Suppress on December 8, 2021, arguing that the room had been searched prior to the officers obtaining a search warrant and that Lester's statement that there were drugs in the hotel room was obtained in violation of Miranda v. Arizona. (ECF

-11-

No. 28.) The government responded on January 14, 2022, disputing
Lester's version of the facts and arguing that the initial entry
into the room and questioning of Lester were lawful. (ECF No.
37.)

## II.  PROPOSED CONCLUSIONS OF LAW

The Fourth Amendment provides that all persons have a right
to "be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures." U.S. Const. amend.
IV. Violations of the Fourth Amendment are often remedied
through the exclusionary rule, which "forbids the use of
improperly obtained evidence at trial." Herring v. United
States, 555 U.S. 135, 139 (2009). However, not all violations of
the Fourth Amendment will trigger the exclusionary rule.
Instead, "police conduct must be sufficiently deliberate that
exclusion can meaningfully deter it, and sufficiently culpable
that such deterrence is worth the price paid by the justice
system." Id. at 144. "[E]vidence should be suppressed only if it
can be said that the law enforcement officer had knowledge or
may properly be charged with knowledge, that the search was
unconstitutional under the Fourth Amendment." United States v.
Buford, 632 F.3d 264, 270-71 (6th Cir. 2011) (quoting Herring,
555 U.S. at 143).

## A.  Standing

As a preliminary matter, the government does not dispute

-12-

Lester's "standing" to bring the present motion and challenge the search of the room. (T. 210.) Even if they had, the undersigned finds that there is more than enough evidence to show that Lester was an overnight guest in Room 110 and thus had a reasonable expectation of privacy in the room. United States v. Allen, 720 F. App'x 254, 257 (6th Cir. 2018) ("[A] person's status as an overnight guest is alone enough to show that he had an expectation of privacy[.]") (citing Minnesota v. Olson, 495 U.S. 91, 96-97 (1990) and Minnesota v. Carter, 525 U.S. 83, 90 (1998)). "Under the Fourth Amendment, an occupant of a hotel room has a reasonable expectation of privacy, even though he is a guest, not an owner, of the room." United States v. Caldwell, 518 F.3d 426, 429 (6th Cir. 2008). For purposes of the Fourth Amendment, the hotel room of an overnight guest "function[s] as home." Allen, 720 F.App'x at 257.

Room 110 may not have been rented in Lester's name, but it is clear he was an overnight guest. The room was rented to Phillips, who was known to be Lester's girlfriend. (T. 34.) A confidential informant had told police Lester was staying in Room 110 with Phillips, (T. 35), and police confirmed with hotel staff that Phillips had rented the room and was staying there. (T. 36.) A bag of men and women's clothes was found in the room as well, providing further evidence that Lester and Phillips were both staying there. (T. 175); see United States v. Waller,

-13-

426 F.3d 838, 844 (6th Cir. 2005) (reasonable expectation of privacy found for a non-overnight guest who left luggage at someone else's home and was permitted by the host to store items there).

**B.    Initial Entry and Protective Sweep**

Officers came to Room 110 with valid arrest warrants for both Lester and Phillips, a fact that Lester does not dispute. "An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." United States v. Pruitt, 458 F.3d 477, 482 (6th Cir. 2006) (quoting Payton v. New York, 445 U.S. 573, 603 (1980)). However, "once the subject of an arrest warrant is found within a home, 'the arrest warrant does not justify a more intrusive search of the premises.'" El Bey v. Roop, 530 F.3d 407, 420 (6th Cir. 2008) (quoting United States v. Stover, 474 F.3d 904, 911 (6th Cir. 2007)). Instead, to enter and search, officers must either obtain a separate search warrant for the premises or support their warrantless entry with "some independent exception to the warrant requirement." Id.

One of these independent exceptions allows officers executing an arrest warrant to perform a "protective sweep" of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."

-14-

United States v. Archibald, 589 F.3d 289, 295 (6th Cir. 2009)
(quoting Maryland v. Buie, 494 U.S. 325, 334 (1990)). This kind
of protective sweep does not require any probable cause or
reasonable suspicion. Id. A second type of protective sweep
allows for a search "beyond immediately adjoining areas" but
requires "articulable facts which, taken together with the
rational inferences from those facts, would warrant a reasonably
prudent officer in believing that the area to be swept harbors
an individual posing a danger to those on the scene." Id. The
protective sweep exception seeks to protect officers from
"persons who are dangerous and who could unexpectedly launch an
attack," and is thus limited to searching areas where a person
could reasonably be hiding. United States v. Medina, 631 F.
App'x 682, 684 (11th Cir. 2015) (citing Buie, 494 U.S. at 327).
If officers observe an object with an "immediately apparent"
incriminating character "in plain view" during a legitimate
protective sweep, they need not ignore that object and may
lawfully seize it. United States v. Atchley, 474 F.3d 840, 850
(6th Cir. 2007) (citing United States v. Bishop, 338 F.3d 623,
626 (6th Cir. 2003)).

Lester argues that "there was no sufficiently compelling
governmental interest to justify a warrantless intrusion without
consent or a warrant" once Lester and Phillips were arrested.
The undersigned disagrees. The evidence presented at the

suppression hearing demonstrates that officers did not immediately conduct an intensive search of Room 110 after arresting Lester and Phillips, but instead conducted a quick protective sweep. (T. 26, 47-48, 59-60, 65, 72-73.) As Detective Fox and Deputy Murray both credibly testified, one member of the team performed a protective sweep of Room 110 after Lester and Phillips were pulled out by walking to the bathroom and then turning around and coming back out. (T. 73.) Upon exiting, this officer told Deputy Murray and Detective Fox that he had seen a digital scale in plain view on the nightstand, but did not mention any other evidence, such as the marijuana or gun, that were in more discrete locations. (T. 74.) Photographs supported the testimony that the digital scale was on the nightstand in plain view. (Ex. 6 at 016.)

The undersigned finds that this sweep was valid as a protective sweep of spaces immediately adjoining the area of arrest.[5] Officers had entered Room 110 to arrest Phillips and performed the sweep as she was being taken into custody. (T. 38-39, 72-73.) Room 110 was small; the bathroom and area by the sink "immediately adjoin" the main room where Phillips was

---

[5]The government does not explicitly state which of the <u>Buie</u> tests they believe the sweep at issue is valid under. The undersigned construes the lack of cited articulable facts about a danger on the scene to mean they argue solely for a valid sweep under the first, less stringent <u>Buie</u> test.

arrested, with no door separating the sink area from the main room. See United States v. Kaler, 11 F. App'x 400, 402 (6th Cir. 2001) (reasonable to sweep bathroom immediately adjoining a motel room without probable cause or reasonable suspicion); see also United States v. Penn, No. 1:17-cr-113-TRM-CHS, 2019 WL 7602236, at *7 (E.D. Tenn. Sept. 3, 2019) ("If an apartment is small enough that all of it immediately adjoins the place of arrest and all of it constitutes a space or spaces from which an attack could be immediately launched, then the entire apartment is subject to a limited sweep of spaces where a person may be found.") (quoting United States v. Thomas, 429 F.3d 282, 287-88 (D.C. Cir. 2005) (internal quotation marks omitted)). There is no evidence to support Lester's theory that the room was thoroughly searched immediately following the arrest.[6] The undersigned finds that a valid protective sweep of Room 110 was performed pursuant to the execution of arrest warrants for Lester and Phillips.

## C.    Pre-__Miranda__ Questioning and the Public Safety Exception

Lester also argues that the search warrant was improperly obtained because it relied on the custodial questioning of Lester before he received Miranda warnings, specifically, Deputy

---

[6]While the timestamps on the photographs of the search were incorrect, the photographs themselves prove that they were taken after the search warrant was issued, given that a photo of the signed search warrant inside Room 110 was taken in sequence with the other photos. (Ex. 6 at 5.)

Murray's question about whether he had "anything else on [him], drugs or anything that will harm me, stick or harm me." (T. 45.) A person subjected to custodial interrogation must be notified of their Fifth Amendment right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). "The Supreme Court has defined custodial interrogation as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." United States v. Malcolm, 435 F. App'x 417, 420 (6th Cir. 2011) (quoting Miranda, 384 U.S. at 444) (internal quotation marks omitted). Questioning that follows a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" is typically considered custodial interrogation. Id. (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Lester was formally arrested and then asked by Deputy Murray whether he had any other drugs on him or other items that could hurt him; there is no dispute that he was in custody when this question was asked.

However, the Supreme Court has loosened Miranda's strict procedures when "officers ask questions necessary to secure their own safety or the safety of the public" as opposed to "questions designed solely to elicit testimonial evidence from a suspect." United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007) (quoting New York v. Quarles, 467 U.S. 649, 659 (1984)).

-18-

This exception applies "when officers have a reasonable belief based on articulable facts that they are in danger." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Whether a belief is reasonable is judged under an objective test and is not based on an officer's subjective state of mind. Williams, 483 F.3d at 428. The objective test considers "a number of facts, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged crime, and the facts and circumstances confronted by the officer when he undertakes the arrest." Id. However, at a minimum, an officer "must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than the police might gain access to that weapon and inflict harm with it." Id.

Despite often writing that the public safety exception "applies if and only if both of those two conditions are satisfied," courts have consistently held that the public safety exception allows questions that ask about more than just weapons. Id. The Sixth Circuit addressed whether the public safety exception extends to questioning about items beyond just weapons in United States v. Mohammed. 501 F. App'x 431, 444 (6th Cir. 2012) ("[W]e have not specifically addressed if questions about whether a suspect is carrying drugs or drug paraphernalia, in anticipation of a pat down, are permissible under the public-

safety exception."). In <u>Mohammed</u>, an arresting officer asked the defendant "whether he had any weapons, drugs, or anything sharp that would stick him" before conducting a pat-down, all before administering <u>Miranda</u> warnings. <u>Id.</u> at 443. In response, Mohammad denied having drugs or weapons on him. <u>Id.</u> at 434. The Sixth Circuit noted that because the suspect was a "drug trafficker" and suspected of drug dealing, the officer "had a reasonable belief that [the suspect] presented a safety threat." <u>Id.</u> at 444 (citing <u>United States v. Williams</u>, 272 F. App'x 473, 477-78 (6th Cir. 2008) (recognizing that drug traffickers have a propensity to carry weapons)). The panel acknowledged that the officer's question extended beyond weapons, but found that other circuits generally have held that "these type of [drug-related] preliminary questions are appropriate under the public-safety exception."[7] <u>Id.</u> The Sixth Circuit then found the following:

---

[7]Of the three cases cited by the panel, two involved police questioning that did not mention drugs at all. <u>See United States v. Reyes</u>, 353 F.3d 148, 152-53 (2d Cir. 2003) (asking a suspect "whether he had anything on his person that could harm the officer" within the public safety exception); <u>United States v. Lackey</u>, 334 F.3d 1124, 1227-28 (10th Cir. 2003) (asking a suspect "do you have any guns or sharp objects *on you*" within the public safety exception) (emphasis in original). Only one of the cited cases explicitly held that an officer asking a suspect whether he possessed drugs was within the public safety exception. <u>United States v. Carrillo</u>, 16 F.3d 1046, 1049 (9th Cir. 1994) (asking a suspect whether he "had any drugs or needles on his person" before a pat down within the public safety exception). Cases from other circuits do support the proposition that asking about needles or other potentially harmful objects is within the public safety exception. <u>United</u>

> Similarly to other circuits, we conclude that the
> officer's question whether Mohammed, a suspected
> heroin dealer, had drug paraphernalia on his person
> that could harm the officer in conducting a routine
> pat down stems from an objectively reasonable concern
> for the officer's safety. Accordingly, we find that
> the officer's question was proper under the public-
> safety exception *to the extent that it asked about
> weapons or other harmful objects.* Even if we were to
> conclude otherwise, the admission of Mohammed's
> statements in response to the officer's pre-
> *Miranda* question pertaining to whether Mohammed had
> drugs or anything that could "stick" the officer are
> harmless. Mohammed responded to the officer's question
> in the negative. Surely, the admission of a statement
> that Mohammed did not possess drugs or drug
> paraphernalia on his person does not prejudice his
> defense.

Id. (emphasis added). Given the Sixth Circuit's express

limitation to "weapons or other harmful objects," this holding

does not answer the question at issue here: whether an officer's

question about drugs on a suspect's person, in conjunction with

questions about weapons or harmful objects, during a pat down

incident to arrest is within the public safety exception to

Miranda.

Without endorsing a *per se* rule allowing officers to

question suspects about drugs during a post-arrest pat down, the

undersigned finds that the question asked here was within the

---

States v. Young, 58 F. App'x 980, 981 (4th Cir. 2003) ("do you
have any sharp objects, knives, needles, or guns" within the
public safety exception); United States v. Webster, 162 F.3d
308, 332 (5th Cir. 1998) (asking whether defendant had any
needles in his pockets that could injure the officers within the
public safety exception).

public safety exception. Three considerations point towards this
finding. First, the unique facts of the case and timing of the
question help assure that "the arresting officer's questions
were sufficiently limited in scope and were not posed to elicit
incriminating evidence." Reyes, 353 F.3d at 154. Deputy Murray's
question came only *after* he had arrested Lester, begun patting
him down, and found both a baggie of suspected crack cocaine and
a large wad of cash, which made it "objectively reasonable" for
Murray to assume that Lester may have firearms or "other
narcotics equipment" (which could include needles, razor blades,
or other sharp objects) on his person. Id. ("Indeed, we have
often recognized that firearms and sharp objects, such as razor
blades and hypodermic needles, are 'tools of the drug trade'")
(citing United States v. Wiener, 534 F.2d 15, 18 (2d Cir. 1976)
and United States v. Pigrum, 922 F.2d 249, 254 (5th Cir. 1991));
see also Mohammed, 501 F. App'x at 444. Second, Deputy Murray's
phrasing limited the question to his own safety, even though it
mentioned drugs, and limited the question's risk of eliciting an
incriminating response. (T. 39) ("You got anything else on you,
drugs or anything, *that will harm me*, stick or harm me?")
(emphasis added); compare with United States v. Castaneda, 196
F. Supp. 3d 1065, 1072-73 (D. Ariz. 2016) (Asking "if there was
anything on the bicycle that [the officer] needed to know about"
was not within public safety exception due to question being

-22-

"vague and investigative."). Deputy Murray's question asked about any drugs that would harm him, not drugs generally, and was limited in scope to things "on" Lester's person, which presents little risk of incrimination "because the officers would have inevitably uncovered any [evidence] during a search incident to arrest." Reyes, 353 F.3d at 154; see also Lackey, 334 F.3d at 1228 ("Because officers have the right to, and will, search the person of an arrestee, they will learn soon enough whether the arrestee is carrying a dangerous object.") Third, Deputy Murray did not ask Lester any more questions after Lester responded with "there's some weed in the room," which "heightens our confidence that, in this case, the narrowly tailored question was a reasonable attempt by a police officer to insure his personal safety in the midst of a search." Carrillo, 16 F.3d at 1050.

The undersigned agrees with the Second Circuit's concern that "there is an inherent risk that the public safety exception might be distorted into a *per se* rule as to questioning people in custody on narcotics charges." Reyes, 353 F.3d at 155 (quoting United States v. Reyes, 249 F. Supp. 2d 277, 282 (S.D.N.Y. 2003) (internal quotation marks omitted)). "It cannot become a matter of course to precede every Miranda warning with the questions that were put to [Lester]." Id. However, Deputy Murray's question came only after he had arrested Lester and

-23-

found drugs on his person, and in the context of executing arrest warrants for two aggravated assaults involving a firearm. Deputy Murray was a U.S. Marshal working on an active fugitive investigation, and neither he nor other officers on the scene were conducting a narcotics-focused investigation. Under the specific facts of this case, the undersigned finds that Deputy Murray's question was supported by "an objectively reasonable concern for the officer's safety" and accordingly was within the public safety exception to Miranda. Mohammed, 501 F. App'x at 444. Deputy Murray's question did not violate Lester's Fifth Amendment rights and therefore suppression of the evidence obtained from Room 110 is unwarranted.

**D.    Independent Source**

Even if Deputy Murray's question violated Lester's Fifth Amendment rights, the undersigned finds that the evidence obtained from Room 110 would have been obtained independently. For the sake of argument only, this section presumes that Lester's incriminating response that there were drugs in the motel room was obtained illegally, in violation of Miranda.

When a search warrant is issued "based on both illegally and legally obtained information, the evidence obtained is still admissible if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" United States v. Duncan, No. 5:20-49-KKC-MAS, 2020

-24-

WL 5801079, at *5 (E.D. Ky. Sept. 29, 2020) (quoting Untied
States v. Leake, 95 F.3d 409, 412 (6th Cir. 1996)). The
"independent source" doctrine, as it is known, requires that the
government show by a preponderance of the evidence that "(1) the
initial [illegal conduct] did not prompt officers to seek a
warrant [], and (2) a neutral magistrate would have issued the
search warrant even if never presented with the illegally
obtained information."[8] Id. (citing Murray v. United States, 487
U.S. 533, 542 (1988)). The first prong requires the court to
assess the record while avoiding giving "dispositive effect to
officer assurances that a warrant would have been sought in the
absence of the illegal [conduct]" where "the facts render [such]
officer assurances implausible." United States v. Williams, 656
F. App'x 751, 753 (6th Cir. 2016) (citing Murray, 487 U.S. at
540 n.2). The second prong requires the court to determine
whether "a neutral magistrate would have issued the search
warrant even if she was not presented with the information
obtained from the illegal [conduct]." Id. (citing United States
v. Jenkins, 396 F.3d 751, 758 (6th Cir. 2005)). To make this
determination, courts excise any illegally obtained information
from the affidavit and then determine whether remaining, legally

---

[8]The case law regarding the independent source exception was
largely developed around situations where an initial illegal
search was followed by a second legal search. The phrasing of
quotes has been changed to reflect the application to verbal
statements.

obtained information supports probable cause to issue the warrant. Jenkins, 396 F.3d at 760. Probable cause is found if "there is a fair probability that contraband or evidence of a crime will be found in a particular place" based on "a practical commonsense decision [] given all the circumstances set forth in the affidavit" supporting a warrant application. Shamaeizadeh v. Cunigan, 338 F.3d 535, 551 (6th Cir. 2003) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Assessing the search warrant for Room 110 without Lester's statement, the undersigned finds the two prongs of the independent source doctrine are met. The government offered evidence that the search warrant would have been sought even without Lester's incriminating statement, and the facts support this finding as well. (T. 141) (Q: "If the defendant had not made that statement, 'there's some weed in the room,' would you still have applied for the search warrant?" A: "Yes, ma'am." . . . Q: "Why is that?" A: "Because Mr. Lester was seen in that room by detectives and he was detained and he was found to have cocaine on his person and there's a reasonable likelihood that there would be more drugs inside of the room.") Lester was a fugitive wanted for aggravated assault with a firearm, who upon being arrested was found with drugs on him. Additionally, a digital scale was seen in plain view during the protective sweep of the room.

Further, the undersigned finds that, even without Lester's statement, the warrant was supported by probable cause. The affidavit in support of the warrant noted that Lester was found with 4.7 grams of cocaine on his person immediately after being pulled from the room and that a digital scale was seen in plain view during a protective sweep of the room. (Ex. 3 at 2.) These facts certainly create a fair probability that other drugs would be found in the room. While the Sixth Circuit has previously held that an affidavit stating only that a suspect was arrested outside of his home with drugs on him does not provide probable cause for a search of the home, the affidavit here was supported by more. United States v. McPhearson, 469 F.3d 518, 524 (6th Cir. 2006) (finding search warrant deficient when supported solely by facts that defendant was arrested for an assault warrant outside of his home and that he had drugs on him). Specifically, the presence of the digital scale, a common piece of "drug paraphernalia," in plain view inside the room provided a potential "nexus between the place to be searched and the evidence to be sought." Id.; (Ex. 3 at 2) (listing items to be searched for as "marijuana, cocaine, crack-cocaine, drug paraphernalia, drug ledgers, drug proceeds and electronic storage devices"). Even without Lester's statement, the warrant here would have been supported by probable cause.

### III.   RECOMMENDATION

For the reasons described above, it is recommended that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

April 7, 2022
Date

**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**